BRYAN T. DAKE
Assistant U.S. Attorney
ERIC E. NELSON
Special Assistant U.S. Attorney
U.S. Attorney's Office
James F. Battin Courthouse
2601 Second Avenue North, Suite 3200
Billings, MT 59101
Phone: 406-657-6101
Fax: 406-657-6058
Email: Bryan.Dake@usdoj.gov

ATTORNEYS FOR PLAINTIFF
UNITED STATES OF AMERICA

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| UNITED STATES OF AMERICA, | CR 17-143 -BLG-SPW |
|---|---|
| Plaintiff, | |
| vs. | OFFER OF PROOF |
| MARK HURST, | |
| Defendants. | |

Plaintiff, United States of America, by and through its counsel of record, Bryan T. Dake and Eric E. Nelson, hereby files its Offer of Proof.

### THE CHARGE

The defendant, Mark Hurst, will plead guilty to the sole count of the superseding information charging Clean Air Act – Negligent Endangerment, in

1

violation of 42 U.S.C. § 7413(c)(4) and 18 U.S.C. § 2.

## PLEA AGREEMENT

The defendant agrees to plead guilty to the sole count of the superseding information pursuant to a written plea agreement. The United States presented any and all formal plea offers to the defendant in writing. The motion for change of plea filed with the Court represents, in the government's view, the most favorable disposition of the case against the defendant. *See e.g., Missouri v. Frye*, 132 S. Ct. 1399 (2012).

## ELEMENTS

In order for the defendant, Mark Hurst, to be found guilty of the charge contained in the superseding information, the United States must prove each of the following elements beyond a reasonable doubt,

First, that the defendant is a person, either an individual or corporation;

Second, that the defendant negligently;

Third, released into the ambient air[1];

Fourth, a hazardous air pollutant or any extremely hazardous substance[2];

---

[1] "Ambient air" means that portion of the atmosphere not completely enclosed in a building or structure.
[2] A hazardous air pollutant or extremely hazardous substance is one that is listed pursuant to 42 U.S.C. § 7412 or 42 U.S.C. § 11002(a)(2) respectively. 42 U.S.C. § 7413(c)(4). The Natural Gas Condensate in this case contained hexane and xylene, both listed hazardous air pollutants under 42 U.S.C. § 7412(b)(1).

Fifth, and at the time of the release, the defendant thereby negligently; and

Sixth, placed another person in imminent danger of death or serious bodily injury.

## PENALTY

The offense in the superseding information carries a maximum punishment of one year imprisonment, a $100,000 fine, one year of supervised release, and a $25 special assessment.  Pursuant to the plea agreement, the defendant has agreed to restitution pursuant to 18 U.S.C. § 3663A(a)(3).

## ANTICIPATED EVIDENCE

If this case were tried in United States District Court, the United States would prove the following:

Custom Carbon Processing (CCP) is a Canadian waste oil processing company.  CCP began its investment in the waste oil processing business in approximately 2006 or 2007 at an outdoor facility in Gillette, Wyoming.  In 2010, CCP began operating an oil reclamation facility in Sidney, Montana.   CCP then decided to look for a new facility.  In late 2010 into early 2011, CCP purchased a site located approximately 10 miles southeast of Wibaux, Montana, known as the "Michel's Saltwater Disposal Well."  Mark Hurst would later serve as the Project Manager at this facility.

At the Gillette facility, CCP became involved with an electrician in Wyoming, who was not experienced in waste oil reclamation, and contracted with

him for electrical work. The electrician's role expanded to duties outside of his area of knowledge and soon he contracted with CCP to operate the oil reclamation activities at the Gillette facility. CCP then asked the electrician's company to help construct the oil reclamation and processing facility at theWibaux site.

The construction of the Wibaux facility occurred in the spring and summer of 2012. CCP's Mark Hurst was assigned to be the Project Manager for this facility. The site was assembled and plumbed with six 400-gallon tanks positioned halfway inside and halfway outside the eventual pole barn that was constructed around the tanks. This was a similar design to one the electrician previously observed at a facility in Utah. The six tanks were designed so that they could hold and heat slop oil awaiting treatment, water destined for injection disposal, or recovered oil ready for sale. Also constructed inside the facility was a below-ground sump using two halves of a tank, covered with metal grating, which contained a "shale shaker" designed to filter out large solid materials from the slop oil as the first separation step.

The Wibaux facility began operations in the summer and fall of 2012. Initial operations showed that the facility would fill with hydrocarbon fumes and the electrician was asked by CCP to install powered fans on the roof vents. Although five horsepower, explosion proof fans were requested, CCP only purchased and installed ½ horsepower fans that were too small to adequately ventilate the hydrocarbon vapors during oil reclamation operations. Similarly, the electrical system installed was inadequate and CCP did not pay for explosion proof wiring

for the facility. And a regular, not explosive proof door, was used as a door to the employee break room, which allowed vapors from the processing area to enter the break room.

Mark Hurst was aware of the ventilation and electrical problems at the Wibaux facility. In a July 4, 2012 email from Hurst to other CCP management, he noted the risks posed at the facility due to its design and build. In regard to the electrical panels, Hurst noted "[w]e also run the risk of killing someone, not only our operators but also customers." In a November 2012 email from Hurst to other CCP management, he again noted "outstanding deficiencies" at the Wibaux facility, including issues with the venting at the facility and noted "I wanted all things venting into the building to be vented out the building …". Even with this information, Hurst continued to work at the Wibaux facility as its Project Manager and the facility remained open.

The hazards posed at the Wibaux facility compounded when CCP management decided to accept shipments of a highly flammable, natural gas condensate at its Wibaux facility in the fall of 2012. Natural gas condensate consists generally of hydrocarbons, hexane, toluene, xylene, and benzene. Later testing of the exact substance at the Wibaux facility confirmed that the material contained a variety of hydrocarbon substances that are "hazardous air pollutants" under the Clean Air Act. Further, due its flammability and explosive properties, natural gas condensate is also considered an "extremely hazardous substance" for the purposes of the Clean Air Act. Workers at the facility noted and raised issues

with the dangerous nature of this product, including informing Hurst of these issues.  Yet, the facility continued to operate.

On December 29, 2012, a load of natural gas condensate was delivered to the Wibaux, Montana.  Normal operating procedure at the facility was to off-load the natural gas condensate from the truck into large holding tanks on the west side of the facility. However, on this day, the underground line to the facility was frozen and the condensate was offloaded directly into the main bay of the facility. Prior to delivery of this load, a CCP shift foreman, John Doe 1, had warned CCP management, including Hurst, that he did not have room to store the natural gas condensate.  Despite this warning, the foreman was ordered to accept the shipment and find some place to store it.

After connecting hoses from the truck into the facility, personnel began pumping the condensate into the "shaker."  As they pumped the condensate, the hazardous air pollutants and flammable vapors filled the entire building, including an adjacent employee break room.  An ignition source in the building ignited the vapors, causing an explosion and fire that injured employees and burned the Wibaux facility to the ground.

Two workers at the CCP facility, John Doe 1 and John Doe 2, were injured in the explosion at the Wibaux facility, and both were aware of safety issues with the facility.  One of these workers stated he had daily contact with Hurst, the Project Manager.  The workers had previously noted that the building was poorly ventilated and required seven to eight bay doors to be opened to allow the vapors

to properly vent and recalled exposure to high concentration of vapors each morning when they opened the Wibaux facility.

Subsequent investigation by the EPA-CID and the US Department of Transportation OIG revealed that CCP's oil processing facility in Wibaux was designed in a flawed manner that allowed the release of hazardous hydrocarbon vapors into the air during the processing operation, exposing CCP employees to the hazardous releases on a daily basis, and posing an extreme risk of fire or explosion.

The United States would have presented this evidence through the testimony of law enforcement, expert witnesses, and lay witnesses.

DATED this 26th day of February, 2019.

          KURT G. ALME
          United States Attorney

          /s/ Bryan T. Dake
          BRYAN T. DAKE
          Assistant U.S. Attorney
          Attorney for Plaintiff